Upon a motion for an injunction to stay the proceedings on- a judgment obtained at the last term held for this district, by Mary Hawkins, against the said Peter Hamper, under an act of assembly, entitled, “an act reducing into one, the several acts concerning the establishment, jurisdiction, and power of district courts.”
*The court is of opinion, that the said question should be adjourned to the General Court for novelty and difficulty, as to the constitutionality of the said law in this behalf. Whereupon,
At a. General Court held at the capitol in the city of Richmond, on Saturday the ninth day of November, in the year of our Eord, one thousand seven hundred and ninety-three —Present, Saint George Tucker.
And from thence continued by adjournments until Saturday, November 16, 1793.— Present, St. George Tucker, John Tyler, James Henry, Spencer Roane, and William Nelson, jun. esquires, judges.
The honorable the judges, delivered their respective opinions touching the case aforesaid, in the following manner :
JUDGE NELSON.
This is a motion for an injunction, adjourned from the District Court of Dumfries on the constitutionality of the eleventh section of the district court law,* which gives the district court in term time, or a judge thereof in vacation, the same power of granting injunctions to stay proceed-23 ings on any judgment obtained *in a district court, and of proceedings to the dissolution or final hearing of suits commencing by injunction, under the same rules and regulations as are now prescribed to the high court of chancery.
I shall consider the question under two points.
First. Whether, if this clause be contrary to the constitution of this commonwealth, it can be executed.
And, Secondly, Whether it be contrary to the constitution.
I. As to the first point, although it has been decided by the judges of the court of appeals, (whether judicially or not is another question,) that a law contrary to the constitution is void—I beg leave to make a few observations on general principles.
The difference between a free and an arbitrary government I take to be—that in the former limits are assigned to those to whom the administration is committed; but the latter depends on the will of the departments or some of them. Hence the utility of a written constitution.
*A Constitution's that by which the powers of government are limited.
It is to the governors, or- rather to the departments of government, what a law is to individuals—nay, it is not only a rule of action to the branches of government, but it is that from which their existence flows, and by which the powers, (or portions of the right to govern,) which may have been committed to them, are prescribed-—It is their commission—nay, it is their creator.
The. calling this instrument the constitution or form of government, shews that the framers intended it to have this effect, and I shall presently endeavour to obviate the objection arising from the want of their appointment in form.
*The present question is whether an act of the legislature contrary to it, be valid?
†This is the paper by which the delegates and representatives of the people, viewing with concern the deplorable situation to which this country must have been reduced unless some regular adequate mode of civil polity had been speedily adopted, did ordain and declare the future form of government to be as there set forth.
*13 This is the paper which divides the government into three distinct departments, with one exception.*
This is the very paper under which there are two branches of legislature now assembled.
This is the very paper under which they are to meet once every year, or oftener.
This is the very paper which gives them their style—of the General Assembly of Virginia.
*This is the very paper which calls one house the house of Delegates, and the other the Senate.
This is the very paper which declares that the former shall consist of two representatives from each county, chosen by freeholders, &c.
This is the very paper which fixes the number of the senate to twenty-four—which defines the number that shall compose a house of senate,—under which the state is to be divided into twenty-four districts.
Which declares that each county shall vote for a senator, who besides other qualifications shall be twenty-five years of age;—that a comparison of polls shall be made by the sheriffs, who are to return the person having the greatest number of votes.
. That a certain number are to be displaced by rotation.
That writs may issue from each house for supplying vacancies.—And—
That all laws shall originate in the house of delegates subject to amendment by the senate, except money bills.
I ask then, whether the legislature do not sit under the constitution?
*The answer in the affirmative to me is inevitable.
But it may be objected that, although the legislature would be bound by a fundamental regulation, made by a convention or other body delegated expressly fpr such a purpose, the body who formed this, not having been thus specially appointed,—this act possesses not sufficient sanctity ; but is an act equal only to those of a common legislature, because some acts passed in the same session are confessedly so.
Here let it be remembered that the question is not whether the people can change it, but whether the legislature can do so.
As to the powers of the convention, this body seems to have been appointed, not only to see that the commonwealth sustained no injury, but also to consult in general for the public good, and in such a crisis as that at which our government was formed, those who are delegated have authority more extensive than a legislature appointed under a government, one object of which is to restrain that as well as the other departments,—whereas in the former case the people alone can decide whether these powers have been strained too far.
As to some acts of the same session being temporary and others revocable by the legislature.—
*1 answer, that the subject-matter of them will evince which are intended to be of this nature, and if any were designed to be permanent, they must be so until changed by the people, unless indeed calling these ordinances and the other a Constitution,* sufficiently manifest a design that this should be of higher authority than those.
It is confessedly the assent of the people which gives validity to a Constitution.
May not the people then, by a subsequent acquiescence and assent, give a Constitution, under which they have acted for seventeen years, as much validity, at least so long as they acquiesce in it, as if it had been previously expressly authorized?
The people have received this as a Constitution. The magistrates and officers down to a constable (for even the mode of his appointment is directed) have been appointed under it.
The people have felt its operation and acquiesced.
Who then can change it?—I answer, the people alone.
*But it has been supposed that the legislature can do this.
To decide this question, I have already stated that the legislature derived their existence from the Constitution.
It may be answered that those members who passed the law under contemplation were elected under the act of 1785.
But who held the election ? Who was to decide in case of an equality of votes? and, who certified the persons elected ?—The sheriff under the law. Who appointed the sheriff? The executive.—By what authority ?—Under the fifteenth article of this Constitution, which the legislature from their acts acknowledge to be inviolable.
If then the legislature were elected at an election holden by, and were returned by a sheriff, who derives his commission from the Constitution, does not that body derive its existence from the same source ?
And can the legislature impugn that charter under which they claim, and to which by their acts they themselves have acknowledged an obligation ? I apprehend not, nor can any argument against this position 30 be drawn *from an acquiescence in some acts which may be unconstitutional.
1st. Because we may presume, that if there be any such, their unconstitutionality has not yet been discovered by the legislature, which, if it had been done, (from the instance before recited, and some other instances) we have reason to think, would have produced a similar declaration from that body.—And
2dly, Because no individual may have yet felt the operation of them, and consequently they have not been brought to investigation.
But the greatest objection still remains, that the judiciary, by declaring an act of the legislature to be no law, assumes legislative authority, or claims a superiority over the legislature.
In answer to this,—I do not consider the judiciary as the champions of the people, or *14 of the Constitution, bound to sound the alarm, and to excite an opposition to the legislature.—But, when the cases of individuals are brought before them judicially, they are bound to decide.
And, if one man claim under an act contrary to the Constitution, that is, under 31 what is no law, (if my former *position, that the legislature can not impugn the Constitution, and consequently that an act against it is void—be just,) must not a court give judgment against him ?*
Nor is it a novelty for the judiciary to declare, whether an act of the legislature be in force or not in force, or in other words, whether it be a law or not.
*In many instances one statute is virtually repealed by another, and the judiciary must decide which is the law, or whether both can exist together.
The only difference is, that in one instance that which was once in existence is carried out of existence, by a subsequent act virtually contrary to it, and in the other the prior fundamental law has prevented its coming into existence as a law.
With respect to the idea that for the judiciary to declare an act of the legislature void, is to claim a superiority to the legislature,—if the legislative authority is derived from the constitution, and such a decision be a judicial act (as I have endeavored to prove) this objection seems to be refuted.
Eor the reasons which I have given, I am of opinion that the fundamental act of government controls the legislature, who owe their existence and powers to it;—this concludes the first point'—-
That if the clause under consideration be unconstitutional, it is void.
II. The second point—whether it be unconstitutional, is next to be considered.
*By the fourteenth section of the Constitution, “the two houses of assembly shall, by joint ballot, appoint judges of the supreme court of appeals, and general court, judges in chancery, judges of admiralty, &c.”
I was at first inclined to think that the insertion of the word judges between the general court and chancery, evinced an intention that the judges of the general court and those in chancery should be distinct persons ; but perhaps it would be unjustifiable to rest such an opinion on so critical a construction.
However, this opinion is supported by the sixteenth and seventeenth sections.
By the sixteenth, the governor and others offending against the state, by mal-administration, corruption, &c., are impeachable before the general court. And,
By the seventeenth, the judges of the general court are to be impeached before the court of appeals. This might'prove then that a judge of the general court could not, according to the Constitution, be a judge of the supreme court of appeals, because all officers (except the judges of the general court), are to be tried before the general court; but judges of the general court, are to be tried before the court of appeals —-and 34 *the Constitution intended to prevent a man being tried in that court of which he is a member; because in causes which might give rise to an impeachment, the judges of a court might act jointly, and the influence of partiality, or an esprit du corps, was to be guarded against.
However, to decide whether a judge of the general court could be a judge of the court of appeals, would be extrajudicial, as that question is not before the court; but this research enables me to decide the question that is before the court—that is, whether the same person can, under the Constitution, be a judge in chancery, and a judge of the general court? I think that he cannot, for these reasons—■
A judge in chancery is to be tried before the general court.—A judge of the general court cannot be a judge in chancery, because a judge in chancery must be tried before the general court; but if a judge of the general court be a judge in chancery, then he (a judge of the general court) will be tried in the general court, which is against the seventeenth article, which declares that' a judge of the general court shall be impeached before the court of appeals.
My inference is, that a judge in chancery, and a judge of the general court, were intended under the Constitution to be distinct individuals.
*This is one reason against the law ; but there are others also of force. Whoever is appointed a judge in chancery under the Constitution, must be elected by joint ballot, and commissioned by the governor ; neither of which requisitions have been complied with.
On the whole, I am for certifying to the court below, that the motion for an injunction be overruled, the clause under which it is prayed being unconstitutional.
JUDGE ROANE-
This great question was adjourned by me from the district court of Dumfries. I thought it necessary to obtain the opinion of this court, for the government of the several district courts, who might otherwise have differed in their construction of the clause in question, and the administration of 'the law in this instance been consequently partial.
My opinion then was, upon a short consid *15 eration, that the district courts ought to execute this law ; for I doubted how far the judiciary were authorized to refuse to execute a law, on the ground of its being against the spirit of the Constitution.
My opinion, on more mature considerations, is changed in this respect, and I now think that the judiciary may and ought not only to refuse to execute a law expressly 36 *repugnant to the Constitution ; but also one which is, by a plain and natural construction, in opposition to the fundamental principles thereof.
I consider the people of this country as the only sovereign power.—I consider the legislature as not sovereign but subordinate ; they are subordinate to the great constitutional charter, which the people have established as a fundamental law, and which alone has given existence and authority to the legislature. I consider that at the time of the adoption of our present Constitution, the British government was at an end in Virginia : it was at an end, because among many other weighty reasons very emphatically expressed in the first section of our Constitution, “George the Third, heretofore entrusted with the exercise of the kingly office in this colony, had abandoned the helm of government, and declared us out of his allegiance and protection.”
The people were therefore at that period, they were at the period of the election of the Convention, which formed the Constitution, absolved from the former kingly government, and free, as in a state of nature, to establish a government for themselves. But admitting for a moment that the old government was not then at an end, I assert that the people have a right by a convention, or otherwise, to change the existing government, 37 whilst such existing ^government is in actual operation, for the ordinary purposes thereof. The example of all America in the adoption of the federal government, and that of several of the states in changing their state constitutions in this temperate and peaceable manner, undeniably proves my position. The people of Virginia, therefore, if the old government should not be considered as then at an end, permitted it to proceed, and by a convention chosen by themselves, with full powers, for they were not restrained, established then a Constitution.
This convention was not chosen under the sanction of the former government; it was not limited in its powers by it, if indeed it existed, but may be considered as a spontaneous assemblage of the people of Virginia, under a recommendation of a former convention, to consult for the good of themselves, and their posterity. They established a bill of rights, purporting to appertain to their posterity, and a constitution evidently designed to be permanent. This constitution is sanctioned by the consent and acquiescence of the people for seventeen years ; and it is admitted by the almost universal opinions of the people, by the repeated adjudications of the courts of this commonwealth, and by very many declarations of the legislature itself, to be of superior authority to any opposing act of the legislature. The celebrated Vattel in a passage of his, which I will not fatigue 38 this audience by *quoting, denies to the ordinary legislature thepowerof changing the fundamental laws, “for, (says he,) it is necessary that the Constitution of the state be fixed.”
But if the legislature may infringe this Constitution, it is no longer fixed ; it is not this year what it was the last; and the liberties of the people are wholly at the mercy of the legislature.
A very important question now occurs, viz. whose province it is to decide in such cases. It is the province of the judiciary to expound the laws, and to adjudge cases which may be brought before them—the judiciary may clearly say, that a subsequent statute has not changed a former for want of sufficient words, though it was perhaps intended it should do so. It may say too, that an act of assembly has not changed the Constitution, though its words are expressly to that effect; because a legislature must have both the power and the will (as evidenced by words) to change the law, and it is conceived, for the reasons above mentioned, that the legislature have not power to change the fundamental laws. In expounding laws, the judiciary considers every law which relates to the subject: would you have them to shut their eyes against that law which is of the highest authority of any, or against a part of that law, which either by its words or by its spirit, denies to any 39 but the people the power *to change it ? In cases where the controversy before the court does not involve the private interest, or relate to the powers of the judiciary, they are not only the proper, but a perfectly disinterested tribunal;—e. g. if the legislature should deprive a man of the trial by jury— there the controversy is between the legislature on one hand, and the whole people of Virginia (though the medium of an individual) on the other, which people have declared that the trial by jury shall be held sacred.
In other cases where the private interest of judges may be affected, or where their constitutional powers are encroached upon, their situation is indeed delicate, and let them be ever so virtuous, they will be censured by the ill-disposed part of their fellow-citizens : but in these cases, as well as others, they are bound to decide, and they do actually decide on behalf of the people ; for example, though a judge is interested privately in preserving his independence, yet it is the right of the people which should govern him, who in their sovereign character have provided that the judges should be independent; so that it is in fact a controversy between the legislature and the people, though perhaps the judges may be privately interested. The only effect on the judges in such case should be, to distrust their own judgment if the matter is doubtful, or in other words to require clear evidence before they decide in cases where interest may possibly warp the judgment.
*From the above premises I conclude that the judiciary may and ought to adjudge a law unconstitutional and void, *16 if it be plainly repugnant to the letter of the Constitution, or the fundamental principles thereof. By fundamental principles I understand, those great principles growing out of the Constitution, by the aid of which, in dubious cases, the Constitution may be explained and preserved inviolate; those landmarks, which it may be necessary to resort to, on account of the impossibility to foresee or provide for cases within the spirit, but without the letter of the Constitution.
To come now more immediately to the question before the court; can those who are appointed judges in chancery, by an act of assembly, without ballot, and without commission during good behaviour, constitutionally exercise that office ?—The fourteenth article of the Virginia Constitution recites “that the people have aright to uniform government ; and therefore, that no government separate from, or independent of, the government of Virginia, ought to be erected or established within the limits thereof.” Here then is a general principle pervading all the courts mentioned in the Constitution—from which, without an exception, we ought not to depart. If those may be judges who are not appointed by joint ballot, but by an act of assembly, the senate have in that instance more power than the Constitution in-41 tended; *for they control the other branch, by their negative upon the law, whereas if they mixed with that branch in a joint ballot, a plurality of votes of senators and delegates would decide.
If there can be judges in chancery who have no commission during good behaviour, their tenure of office is absolutely at the will of the legislature, and they consequently are not independent. The people of Virginia intended that the judiciary should be independent of the other departments: they are to judge where the legislature is a party, and therefore should be independent of it, otherwise they might judge corruptly, in order to please the legislature, and be consequently continued in office. It is an acknowledged principle in all countries, that no man shall be judge in his own cause ; but' it is nearly the same thing, where the tribunal of justice is under the influence of a party. If the legislature can transfer from constitutional to legislative courts, all judicial powers, these dependent tribunals being the creatures of the legislature itself, will not dare to oppose an unconstitutional law, and the principle I set out upon, viz. that such laws ought to be opposed, would become a dead letter, or in other words, this would pave the way to an uncontrolled power in the legislature. The constitution requires the concurrence of the legislature to appoint, and the executive to commission a judge :—but an appoint-42 ment*by act of assembly, will invest with this high power one who has not the sanction of the executive ; -and will throw a new office upon a man, without the liberty of declining such appointment, if he thinks proper. For these reasons, and others which it would be tedious to enumerate, I am of opinion, that the clause in question, is repugnant to the fundamental principles of the Constitution, in as much as the judges of the general court have not been balloted for and commissioned as judges in chancery, pursuant to the fourteenth article of the Constitution.
MR. ROANE then said, “Although it is not in my opinion now necessary to decide, whether the offices of a judge in chancery and of the general court, m ay be united in the same person or not, supposing a constitutional appointment to have been made of the same person to each—yet in as much as this question is in some measure involved in the one just discussed, I will give my present impressions upon it, leaving myself free to decide hereafter the one way or the other, should it come judicially before me."
The constitution has declared that the three departments of government should be separate and distinct.—There are great political evils which would arise from their union ;—for example, if according to 43 Montesquieu, *the members of the legislature were also members of the judiciary, the same man would as a legislator make a tyrannical law, and then as a judge would enforce it tyrannically. This union, it is evident, would produce a complete despotism.
It is therefore a fundamental principle not only of our constitution, but acknowledged by all intelligent writers, to be essential to liberty, that such an union should not take place.
But is there any great political evil resulting from the same person being a judge in chancery, and of the general court ?
Is there any constitutional impediment ?— 11 would be wise in the legislature to keep the offices separate; for an union of several functions in one person, will put it out of his power to be perfect in either, and the commonwealth will be better served by dividing than by accumulating the public duties.
But it had been said, and I confess with great force, that in as much as the judges in chancery are to be tried, on impeachment, before the general court, if the judges of the general court are also judges in chancery, they in their latter character must be 44 tried before themselves *in their former, and consequently there will be a defect of an impartial tribunal. I can only answer this objection by saying, that the former court of appeals was composed of the judges of the general court, court in chancery, and admiralty.—The legislature might have so organized the said courts as to have had nine-tenths of the court of appeals members of the general court.
The judges of the general court are by the constitution to be tried before the court of appeals, i. e. under that organization, before themselves ;—and the judges of appeals before the general court, which would produce the same dilemma.
This case then is precisely similar to the case before us. And yet the judges of the court of appeals did in the remonstrance of May, one thousand seven hundred and eighty-eight, declare “that the forming the court *17 of appeals, so as to consist of all the judges, is no violation of the constitution thereby overruling the objection which must have occurred in that case as well as in this.
Upon the whole I must say, that however inconvenient and unwise it might be to unite these distinct offices in the same person;— however in the case that has been supposed, there might be a defect of an impartial tribunal to try an offending chancellor upon an impeachment;—still not seeing any express provision in, or fundamental principle 45 !:‘of, the constitution, restricting the power of the legislature in this respect; and grounding myself upon the above recited opinion of the former court of appeals as to the constitutionality of the union of offices which then existed in that body ;—my present impressions are, that there is no constitutional impediment, plainly apparent, against uniting the two offices in the same person.
JUDGE HENRY.
This is an adjourned case from the Dumfries District, and the question (new and difficult) referred to this court is,—Ought the district judges to exercise that branch of chancery jurisdiction committed to them by the last district law, of hearing and deciding all causes brought before them by injunction according to the rules prescribed by law for conducting similar suits in the high court of chancery.
The difficulty and novelty of this case is, that the law in question requires of the common law judges, to exercise chancery jurisdiction, and that without a legal appointment, and without a commission.
The discussion of this subject is no less delicate than it is important.—It is important as it brings in question the rights of the legislature on one of the particular subjects committed to them by the plan of government : it is delicate, as the judges are 46 compelled to examine their 'x'powers, their duties, and the regularity of their appointments, and therefore, they may be considered, in some sense, as judges in their own cause.—But be the subject as delicate as can be supposed possible, and as important as any which can ever come before a court, it is now before us, and I embrace the opportunity, now offered me for the first time, of publicly declaring my opinion.
The importance of the subject requires a particular attention, and thorough examination. We will then have recourse to the revolution and some of the history.
In the year 1776, the people of this country chose deputies, to meet in general convention, to consult of, and take care for, their most valuable interests. These deputies seem to have been complete representatives of the people, and vested with the most unlimited authority. Accordingly, having taken a careful review of the state of their country, they found a number of instances of misrule in the then existing government, and that our prince, by abandoning the helm of government, and declaring the people to be out of his allegiance and protection, had produced a total dissolution of the social baud.
When this was found to be our unhappy situation, our deputies proceedeed, (as of right they might,) to prepare that form of government for us they judged best. 47 * Accordingly, a plan of government was agreed upon, promulged, and accepted by the people, which has been uniformly acquiesced under from that day to this time. But previous to the promulging the plan of government, these deputies declared that certain rights were inherent in the people, which the public servants who might be intrusted with the execution of this government, were never to be permitted to infringe;—for example, the legislative branch were declared to be restrained from interfering with the right of trial by jury in criminal cases; from meddling with the rights of conscience, in matters of religion ; and each of the three branches into which the government was to be divided was declared incompetent to any of the duties of either of the other two.
The judiciary, from the nature of the office, and the mode of their appointment, could never be designed to determine upon the equity, necessity, or usefulness of a law; that would amount to an express interfering with the legislative branch, in the clause where it is expressly forbidden for any one branch to interfere with the duties of the others. The reason is obvious, not being chosen immediately by the people, nor being accountable to them, in the first instance, they do not, and ought not, to represent the people in framing or repealing any law.
There is a proposition which I take to be universally' *true in our constitution, which to gentlemen whose ideas of parliament, and parliamentary powers, were formed under the former government, may not be always obvious ; it is this—We were taught that Parliament was omnipotent, and their powers beyond control; now this proposition, in our constitution, is limited, and certain rights are reserved as before observed ;—if this were always kept in mind, it might free the mind from a good deal of embarrassment in discussing several questions where the duty, and the power of the legislature is considered.
Our deputies, in this famous convention, after having reserved many fundamental rights to the people, which were declared not to be subject to legislative control, did more;—they pointed out a certain and permanent mode of appointing the officers who were to be intrusted with the execution of the government. Though the choice of the officers was intrusted to the wisdom of the legislature, yet the manner of conducting this choice was fixed ; hereby declaring in the most solemn manner, the public will and mind of the people to be, that the laws when made, should be executed by officers chosen and appointed, as therein is directed, and not otherwise ; whereas under the former government, the legislature seemed to have had no bounds to their authority but the negative of the crown, and the public officers were appointed and displaced at the pleasure of the governing powers which then were.
*18 *1 come now to the particular case before the court. Hamper applied to the district court of Dumfries, for an injunction to a judgment obtained at law in that court by Hawkins, under the law which directs the district judges to hear and determine all suits commencing by injunction, under the same rules and regulations as are now prescribed by law, for conducting similar suits in the high court of chancery.
The permanent will of the people, expressed in the constitution, is that the legislature, by joint ballot of both houses, shall appoint judges of the supreme court of appeals and general court, judges in chancery, &c., to be commissioned by the governor, and to hold their offices during good behaviour.
It is alleged by some of my brethren, that the legislature are not warranted in appointing the same men to be judges both at common law and in chancery. The words of the plan of government are, “they shall appoint judges of the high court of appeals and general court, judges in chancery, &c.” These words, judges in chancery, are supposed to design different persons from the judges of the general court, and an argument to inforce this opinion is drawn from sect. 16 and 17, where it is provided, that any judge of the general court, offending against the state, may be prosecuted in the high court of 50 appeals ; but a*chancery judge offending must be prosecuted in the general court; therefore it is alleged, a common law judge cannot be a chancery, nor a chancery a common law judge in our government.
This question has heretofore been alleged as one of the reasons of the high court of appeals for declining to execute a very important law of the land ;—without saying any thing about the propriety or impropriety of that business, it is sufficient for my present purpose to observe, that the question did not then come before the court in a judicial manner,—it was taken up as á general proposition, and when published, contained an appeal to the people; this looked like a dissolution of the government,—therefore I cannot view it as an adjudged case, to be considered as a binding precedent.
It is much to be wished that the question had been then decided, by calling a convention of the people. But unfortunately the legislature neither yielded the point nor insisted, but adopted an expedient.—They newmodelled the courts.—The question then went to sleep, but the legislature preserved the principle ; they appointed judges of the high court of appeals, with unlimited jurisdiction, both in law and equity; they appointed judges of the general court, and a judge in chancery.
*If the common law and chancery jurisdiction ought not to be united in the samp persons in the first instance, I do not see how it can be justified in the appellate jurisdiction. If the form of government has provided that justice at common law ought to be administered by one set of men, and in chancery by another, it seems to me to follow as a necessary inference, that the appellate, as well as the original jurisdiction, ought to be separate and distinct, and that those gentlemen who now exercise the appellate jurisdiction have admitted the legislative construction of the form of government formerly objected to.
But I do not rest the question on this ground. Where I am not bound by regular adjudications of the superior court, I cannot rest on other men’s opinions. I must and will think for myself.
Our government is declared to be founded on the authority of the people. The people, in convention, have ordered that a legislature shall be chosen, a governor and council shall be chosen, judges shall be appointed.— All these different characters are servants of the people, have different duties, and are amenable to them. When the legislature were intrusted with the appointment of judges, I can find no particular characters, or any description of men, declared to be ineligible, but those holding legislature or executive authority, who are forbidden to interfere. To the discretion of the legis52 lature is committed the *choice of the judges, who shall fill all the superior courts, and therefore, if they have chosen, or shall hereafter choose to appoint the same set of men to administer justice to the people, both at common law and in chancery, I cannot find any thing in the form of government to restrain them. They are to appoint judges in chancery, at their discretion ; and for me to say I cannot act as a chancery judge in any case, because if I should offend, I am to be prosecuted for such an offence before my brethren in the general court, seems to be a strange reason forme to assign for declining the office.
I am therefore very clear and decided in my opinion, that the legislature were fully authorized by the form of government, to appoint the district judges to exercise a chancery jurisdiction in the case before us, and I do cheerfully embrace this public opportunity of declaring my hearty approbation of the measure, and my willingness to act when the appointment is regularly made.
This brings me to the second* point in the case. Have the legislature made the appointment in the manner prescribed by the form of government?
I wish most seriously I could give an affirmative answer to this question. It is provided by the form of government, so often alluded to, that judges in chancery shall be chosen by joint ballot of both houses, shall 53 be ^commissioned by the governor, shall hold their office during good behaviour, and to secure their independence and remove them from all temptation to corruption, their salaries shall be adequate and fixed.—If a chancellor in any case must be chosen by ballot, be commissioned and hold his office during good behaviour, surely it is proper, it is necessary in all cases, that every judge shall be so chosen, shall be so commissioned, and hold his office so long as he behaves well. The business of hearing causes originating in that court by injunction, is of a permanent nature. To exercise this duty without the appointment and com *19 mission prescribed by the constitution, would be an exercise of a power according to the will of the legislature, who are servants of the people, not only without, but expressly against the will of the people. This would be a solecism in government,—establishing the will of the legislature, servants of the people, to control the will of their masters, if the word may be permitted. Till the appointment is made agreeable to the directions of the constitution, I cannot think myself duly authorized to take upon me the office.
Before I conclude, I wish to embrace the present opportunity of saying something about what may be called inconsistency in my conduct.—It is well known I sat in the former court of appeals, not being particularly balloted for and commissioned. 54 I have latterly obeyed the ‘commands of the legislature, by sitting in the special court of appeals without any such appointment or commission.
When I was appointed a judge of the court of admiralty, there was a standing law of the land, that ever}' such judge should of course be a judge of the court of appeals, and an oath of office in both courts was prescribed. When I was balloted for, I considered myself as having a general appointment to both the courts, and acted accordingly: and had a commission been applied for as a judge of the court of appeals, it is probable, it might have been granted. However, the legislature, on reviewing this subject, availing themselves of what was then in their opinion judged to be an incomplete appointment, thought themselves authorized to garble the commission, and dismiss one half of the judges, without either giving them notice, or assigning any reason, assuming a right from their own omission, if it was one, to dismiss their judges.— If the legislature were authorized to take this step at that time, it surely furnishes all succeeding judges, as they value their reputation and their independence, to see that their appointment be regular, before entering upon the duties of their office, in future.
This dismission was submitted to, though, in a short time afterwards, the legisla55 ture seems to have forgotten *the principle on which they grounded the dismission of the judges ; for when public convenience seemed to require a special court of appeals in cases where a majority of the judges of that court should be interested, they commanded the judges of the general court to attend in such special court, without either an appointment or commission, which command I have more than once obeyed: and I freely acknowledge, that I consider this special court, with respect to me, who have been neither appointed nor commissioned since the passing of that law, as unconstitutional ; but it is temporary. The case cannot often happen; it is exceedingly disagreeable to be faulting the legislature; and, perhaps, one particular mischief had better be submitted to, than a public inconvenience. These were my reasons for sitting in this special court.
It is most devoutly to be wished, that the present subject, now become the topic of public discussion, may be fully and generally understood, by the legislature, by the judiciary, and by the public at large, that there be no more of these unhappy differences of opinion between any of the different departments of government.
It remains only for me to add, that where I have been appointed and commissioned, I obey with alacrity,—when a new appointment shall be made, and a commission 56 'x'be directed, authorizing me to exercise the office of a judge in chancery,, in any case whatever, I shall then have it in my power to exercise the right of every other freeman,—to accept or refuse,—though I have no difficulty in declaring, were the appointment perfect, that I might hold during good behaviour, I should have no objection to enter upon the discharge of those new duties ;—but until that it is done, in justice to the public, whose rights are concerned, and to myself, as an individual, I must decline the duty prescribed by the law in question, not being as yet such a judge in chancery as the people have said shall exercise that kind of jurisdiction.
Of course, my opinion is that the district court of Dumfries be advised to overrule the motion for an injunction in this cause.
JUDGE TYLER.
I am saved much trouble in the investigation of this case, by the gentlemen whose opinions have been already delivered with so much propriety and sound reason, as it respects the question of the validity of the Constitution.
It is truly painful to me to be under the necessity of saying any thing in support of it at this day ; but since I am reduced to this necessity, I must be indulged with a few observations on the subject.
*1 know it has been the opinion of some critical and speculative gentlemen of considerable merit and abilities too, that our form of government was not authorized by the people, inasmuch as no instructions were given by the people to the convention at the time the Constitution was established.
To investigate this subject rightly, we need but go back to that awful period of our country when we were declared out of the protection of the then mother country—and take a retrospective view of our situation, and behold the bands of civil government cut asunder, and destroyed:—No social compact, no system of protection and common defence against an invading tyrant—in a state of nature, without friends, allies, or resources:—In such a case what was to be done?
Those eminent characters to whom so much gratitude is, and for ever will be due— whose names are enrolled in the annals of America, recommended a convention of delegates to be chosen for that purpose ; who were to meet together for the express design of completely protecting and defending the rights, both civil and religious, of our common country.—The delegates were so elected and convened.—What power had the people therefore that was not confided to *20 their representatives? All their rights, all their power, all their happiness, all 58 their hopes *and prospects of success, were most indubitably entrusted to their care.—They were not betrayed.—The people did not say to their representatives, so far -shall ye go, and no farther.—Happy, indeed, for this country, that no such restraint was laid on them.
In order to protect and defend the common cause then, a system of social duties was formed.—Without this what obedience could have been expected, and how could a regular defence have been made ?
A great variety of departments were established, and those who were to execute them must have been made responsible to some regular power:—And all this was to complete the great work of liberty.
Has not this policy been sufficiently ratified by time and action ? And if it were possible to doubt, under these circumstances, has it not been sealed with the blood of this wide extended empire ? And shall its validity be now questioned ? For what purpose? To revert back to our former insignificancy? It cannot be.
Before I proceed to say any thing on the adjourned case now under contemplation, I will beg leave to make a few observations on the opinion that some gentlemen have taken up, of the impropriety of 59 the judiciary in deciding *against a law which is in contradiction to the Constitution. “
A little time and trouble bestowed on this subject, I am sure, would enable any person, endowed with common understanding, to see the'fallacy of such sentiments.
What is the Constitution but the great contract of the people, every individual whereof having sworn allegiance to it?—A system of fundamental principles, the violation of which must be considered as a crime of the highest magnitude.—That this great and paramount law should be faithfully and rightfully executed, it is divided into three departments, to wit: the legislative, the executive, and judiciary, with an express restraint upon all, so that neither shall encroach on the rights of the other.—In the Bill of Rights many things are laid down, which are reserved to the people—trial by jury, on life and death, liberty of conscience, &c. Can the legislature rightfully pass a law taking away these rights from the people? Can the judiciary pass sentence without a conviction of a citizen by twelve of his peers? Can the executive do any thing forbidden by this bill of rights, or the constitution? In short, can one branch of the government call upon another to aid in the violation of this sacred letter? The answer to these questions must be in the negative.
*But who is to judge of this matter? the legislature only? I hope not.—-The object of all government is and ought to be, the faithful administration of j ustice.—It cannot, I hope, be less the object of our government, which has been founded on principles very different from any we read of in the world, as it has ingrafted in it a better knowledge of the rights of human nature, and the means of better securing those rights.—And were I inclined to borrow a sentiment from any man, in support of my opinion (not as authority, but merely argumentative) I should make use of the following one from the celebrated Hume, in his essay on our government,—viz. “We are therefore to look upon all the vast apparatus of our government, as having ultimately no other object, or purpose, but the distribution of j ustice, or in other words, the support of the judges. King, and parliaments, heads and armies, officers of the court and revenue, ambassadors, ministers, and privy-counseilers, are all subordinate in their end to this part of administration.”—Hence it may reasonably be inferred, that if the commonwealth itself is subordinate to this department of government at times, so therefore will necessarily be the acts of the legislature, when-they shall be found) to violate first principles, notwithstanding the supposed “omnipotence of parliament,” which is an abominable insult Upon the honour and good sense of our country, as nothing is omnipotent as it relates to us, either religious or political, but the God of Heaven a,nd our constitution!
*1 will not in an extra-j udicial manner assume the right to negative a law, for this would be as dangerous as the example before us ; but if by any legal means I have jurisdiction of a cause, in which it is made a question how far the law be a violation of the constitution, and therefore of no obligation, I shall not shrink from a comparison of the two, and pronounce sentence as my mind may receive conviction.—To be made an agent, therefore, for the purpose of violating the constitution, I cannot ■consent to.—As a citizen I should complain of it; as a public servant, filling an office in one of the great departments of government, I should be a traitor to my country to do it. But the violation must be plain and clear, or there might be danger of the judiciary preventing the operation of laws which might be productive of much public good. These premises being admitted, as I think they must, I will now draw a comparison of the law before us with the constitution. The constitution declares there shall be judges in chancery, judges of the general court, &c. ; and the first question that occurs is this—Can th.e office of a judge in chancery and common law be rightfully vested in the same persons, provided the appointment be regular?—To which I answer, I see no incompatibility, in the exercise of these offices, by the same persons—for although they be distinct offices, possessing distinct powers, they do not necessarily blend and run together, because they are placed in the same 62 hands. The judge who knows the ^powers and duties of both, will well know how to keep them apart—like the rays of the sun, they radiate from one common centre, and may run parallel for ever, without an interference.—But to this, an ingenious and subtile argument is offered, and taken from the 17th article of the constitution, wherein it is directed, that when the judges of the general court are impeached, the court of appeals *21 shall set in judgment—hut all other officers of government, shall be impeached before the general court. Therefore, the constitution meant to keep the offices distinct, in distinct hands, because it is possible that they may try one another, and perhaps form a combination, in favour of the fraternity. This is too nice a deduction, and is a better argument in favour of an amendment of the constitution, than of the question under consideration. We cannot supply defects ; nor can we reconcile absurdities, if any there be ; this must be done by the people ; and were we about the business of amendments duly authorized, it might be well to consider this point. But I cannot see why a judge in chancery, if he be a judge also of the general court, may not be tried by the court of appeals ; for if he be convicted of such a crime, as he ought to be displaced from office in either capacity, he would hardly be allowed toholdthe other ; nor do I see why the judges of the general court, cannot try their brothers in chancery.
*The legislature having a knowledge of this case, chose to trust the powers in our hands, as in the case of the high court of appeals who possess both chancery and common law powers, and are yet impeachable before the general court, who ought not to have a stronger sympathy or fellow-feeling for each other than for all the judges. In this case we find the same possible inconvenience, but it is barely possible to suppose that justice and the law will not be the object of a court’s decision, let who will be the culprit, or object of trial. We find the county courts possess these powers, and I do suppose, if the doctrine contended for, on this point, was sound, they would not have been suffered to have rested from the beginning of the revolution to this day, in those courts ; and without arrogating much to ourselves, we may be allowed to hope the trust would be at least as well executed in our hands.—I have nothing to say with respect to the policy of the measure, that will speak for itself; and moreover, it belongs to the legislature to decide.
The next inquiry we are to make, brings Us pointedly to the comparison of the law now under contemplation, and the constitution ; and how does it stand? The constitution says that judges in chancery shall be appointed by joint ballot of both houses of assembly, and commissioned by the governor during good behaviour—and for the most valuable purposes ; to secure the inde64 pendence of the ^judiciary.—Contrary to this express direction, which admits of no doubt, implication or nice construction, that bane to political freedom, the legislature has made the appointment by an act mandatory, to the judges, leaving them not at liberty to accept or refuse the office conferred, which is a right every citizen enjoys, in every other case—a right too sacred to be yielded to any power on earth. But, were I willing to do it as it relates to myself, as a judge I ought not; because it would frustrate that most important object before-mentioned —intended by the constitution to be kept sacred, for the wisest and best of purposes— to wit, that justice and the law be done to all manner of persons without fear or reward.
Eor how would the rights of individuals stand when brought in contest with the public, or even an influential character, if the judges may be removed from office by the same power who appointed them, to wit, by a statute appointment as in this case, and by a statute disappointment as was the case in the court of appeals. Might not danger be apprehended from this source when future times shall be more corrupt? and yet, thank Heaven, the time has not arrived, when any judge has thus degraded his office, or dignity as.a man, by a decision governed by fear or any other base motive; and I hope a long time will yet elapse before this will be 65 the case. But our constitution *was made, not only for the present day, but for ages to come, subject only to such alterations as the people may please to make. Bet me now compare the law and the constitution in the other point; that of the want of a commission during good behaviour, and the reasons will fully or forcibly apply—when I receive the commission, I see the ground on which I stand. I see that my own integrity is that ground, and no opinions, but such as are derived from base motives, can be sufficient to remove me from office—in which case whensoever an appeal is made to me by an injured citizen, I will do him justice, as far as my mental powers will enable me to discover it, without any apprehensions of an unjust attack—that if the proudest sovereign on earth was in contest with the lowest peasant, that creeps through this vale of sorrow, yet should the arm of justice be extended to him also.
To conclude, I do declare that I will not hold an office, which I believe to be unconstitutional ; that I will not be made a fit agent, to assist the legislature in a violation of this sacred letter ; that I form this opinion from the conviction I feel that I am free to think, speak, and act, as other men do upon so great a question ; that as I never did sacrifice my own opinions for the sake of popularity in the various departments I have had the honour to fill, however desirable popular favour may be, when obtained upon honorable prin66 ciples ; so now that I am grown old *1 cannot depart from those motives which I have both in public and private life made my standard—I concur therefore most heartly with my brothers, who have gone before me, in the last two points, that the law is unconstitutional and ought not to be executed ; the injunction therefore must be overruled—and this opinion I form not from a view of the memorials, nor from writers who knew not the blessings of free government, but as they were seen and felt through the prospect of future times, but from honest reason, common sense, and the great letter of a li'ree Constitution !
JUDGE TUCKER.
This question was an adjourned case from the district court of Dumfries, and arose upon the act of 1792, for reducing into one the several acts concerning *22 the establishment, jurisdiction, and powers of the district courts.
Sect, third of that act declares it to be the duty of two of the judges of the general court to attend each district court at their respective terms; and the said two judges shall constitute a court for such district, &c.
Sect, eleventh provides “that each of the said district courts, in term-time, or any judge thereof, in vacation, shall, and may have, and exercise the same power of grant- - ing injunctions, to stay proceedings on 67 . any judgment, ^obtained in any of the ■ said district courts, as is now had, and exercised by the judge of the high court of chancery, in similar cases, and the said district courts, may proceed to the dissolution, or final hearing of all suits, commencing by injunction, under the same rules, and regulations, as are now prescribed by law for conducting similar suits in the high court of chancery.”
• Upon this clause, a motion was made in Dumfries district court, May 23, 1791, for an injunction to stay proceedings on a judgment obtained in that court, and was adjourned hither for novelty and difficulty.
The question which it is now incumbent on this court to decide, seems to me to be shortly this—whether a judge of the general court of this commonwealth, can constitutionally exercise the functions of a judge in chancery ? this calls upon us for a recurrence to fundamental principles, a duty which our bill of rights* expressly imposes upon all the servants _ of the commonwealth. And this renders it necessary not only to investigate the principles upon which our government is founded, but the authority by which it was established; inasmuch as there are doubts in the breasts of many, whether our 68 * Constitution itself is any more than an act of the ordinary legislature, revocable, or subject to alteration by them, in any manner, and at any time.
In considering this question, I shall first state my own impressions, arising from the text of the constitution, and the spirit of our government, only unsupported by any former judicial opinions on the subject—and, secondly, as founded on the authority and decision of the court of appeals.
I. In stating my own' impressions, I shall consider:
1st, Whether the constitution, or form of government of this commonwealth, be an act of the ordinary legislature, and, consequently revocable, or subject to alteration by the same authority; or something paramount thereto 7
. 2dly, Whether, according to that constitution, the functions of a judge of the general court, and a judge in chancery, were intended to be distinct; or might be blended in the same person 7
1st, Whether the constitution be an act of the ordinary legislature; or something paramount thereto 7
It will be remembered by all those who are conversant *with the history of the rise and progress of the late glorious revolution, that the measures which led to the final consummation of that important event, although they originated, in most instances, with the legal and constitutional assemblies of the different colonies, made but a small progress in that channel, particularly in this state. The dissolution of the constitution assemblies, by the governors appointed by the crown, obliged the people to resort to other methods of deliberating for the common good.—Hence the first introduction of conventions: bodies neither authorized by, or known to the then constitutional government; bodies, on the contrary, which the constitutional officers of the then existing governments considered as illegal, and treated as such. Nevertheless, they met, deliberated, and resolved for the common good. They were the people, assembled by their deputies; not a legal, or constitutional assembly, or part of the government as then organized. —Hence they were not, nor could be deemed the ordinary legislature; that body being composed of the governor, council, and burgesses, who sat in several distinct chambers and characters : while the other was composed of a single body, having neither the character of governor, council, or legitimate representative among them : they were, in effect, the people themselves, assembled by their delegates, to whom the care of the commonwealth was especially, as well as unboundedly confided. 69
To prove this distinction still farther. The power of convening the legal assemblies, or the ordinary constitutional legislature, resided solely in the executive : they could neither be chosen without writs issued by its authority, nor assemble when chosen, but under the same authority. The conventions, on the contrary, were chosen, and assembled, either in pursuance of recommendations from congress, or from their own bodies, or by the discretion, and common consent of the people. They were held, even whilst a legal assembly existed. Witness the convention, held in Richmond in March, 1775 : after which period, the legal, or constitutional assembly, was convened in Williamsburgh, by the governor, lord Dunmore ; and continued sitting until finally dissolved by him in June or July, 1775.—No other legal assembly was ever chosen, or convened under the British government.
The convention then was not the ordinary legislature of Virginia. It was the body of the people, impelled to assemble from a sense of common danger, consulting for the common good, and acting in all things for the common safety. It could not be the legitimate legislature, under the then established government, since that body could only be chosen under the permission, and assembled under the authority of the crown of Great Britain.
*But although the exercise of the authority of the executive government under the crown of Great Britain ceased altogether with the dissolution of that assembly in June, 1775, yet a constitutional *23 dependence on the British government was never denied, until the succeeding May, nor dissolved until the moment of adopting the present constitution, or form of government; an event, which took effect by the unanimous voice of the convention, (elected after the final dissolution of the general assembly, as above mentioned, and assembled in Williamsburgh,) on the 29th of June, 1776, after six weeks deliberation thereon,* and eight days before the declaration of independence by the congress of the United States. This was not then the act of the ordinary legislature that dissolved the bands of union between us. It was the voice of the people themselves, proclaiming to the world their resolution to be free ; to be governed only by their own laws; and to institute such a government, as, in their own opinion, was most likely to produce peace, happiness, and safety to the individual, as well as to the community.
*It seems to me an observation of great importance, that the declaration of independence by this state, was first made in that instrument which establishes our constitution. The instant that the declaration of independence took effect, had the convention proceeded no farther, the government, as formerly exercised by the crown of Great Britain, being thereby totally dissolved, there would never have been an ordinary legislature nor any other organized body, or authority in Virginia. Uvery man would have been utterly absolved from every social tie, and remitted to a perfect state o± nature. But a power to demolish the existing fabric of government, which no one will, I presume, at this day, deny to that convention, without authority to erect a new one, could never be presumed. A new organization of the fabric, and a new arrangement of the powers of government, must instantly take place, to prevent those evils which the absence of government must infallibly produce in any case ; but more especially under circumstances so awful, and prospects so threatening, as those which surrounded the people of America, at that alarming period. It would therefore have been absurdity in the extreme, in the people of Virginia, to authorize the convention to absolve them from the bonds of one government, without the power to unite them under any other, at a time when the utmost exertions of government were required to preserve both their liberties and their lives: but since they are both 73 *in form and effect, only' different clauses of the same act, and necessary consequences of each other, to question the validity of the one, is to deny the effect of the other. The declaration of independence, and the constitution, as the acts of the people, must therefore stand, or fall together.
Here let me cite the opinion of an eminent lawyer on the one hand, and of ari enlightened politician on the other, on the subject of two national revolutions, the most familiar to us of any, except our own.
“The revolution of 1688,” says judge Blackstone, 1 Com. 211, “was not a defeasance of the succession, and a new limitation of the crown by the king, and both houses of parliament : it was the act of the nation alone, upon the conviction that there was no king in being.”
“The national assembly of France,” says the ingenious MTntosh, p. 60 “was assembled as an ordinary legislature under existing laws. They were transformed by events into a national convention, and vested with powers to organize a new government. It is in vain that their adversaries contest this assertion -by appealing to the deficiency of forms. It is in vain to demand the legal instrument that changed their constitu74 tion, *and extended their powers. Accurate forms in the conveyance of power are prescribed by the wisdom of the law, in the regular administration of states. But great revolutions are too immense for technical formality. All the sanction that can be hoped from such events is the voice of the people, however informally and irregularly expressed.” (Defence of Fr. Revo. 60.)
Our case was much stronger than either of those. There was at least the shadow of legal, constitutional authority in the convention parliament of Ungland in 1688, as the ordinary legislature ; and the national assembly of France was constitutionally assembled under the authority of the government it subverted. The convention of Virginia had not the shadow of a legal, or constitutional form about it. It derived its existence and authority from a higher source ; a power which can supersede all law, and annul the constitution itself—namely, the people, in their sovereign, unlimited, and unlimitable authority and capacity.
From what I have said, I am inclined to hope, that it will appear that our constitution was not the act of the ordinary legislature : a few words concerning its operation, authority, and effect, as the act of the people, may not be improper.
*“A constitution,” says the celebrated Paine, “is not a thing in name only, but in fact. It has not an ideal, but a real existence; and wherever it cannot be produced in a visible form, there is none. A constitution is a thing antecedent to government, and a government is only the creature of a constitution. It is not the act of the government, but of the people constituting a government. It is the body of elements to which you can refer, and quote article by article, and which contains the principles on which the government shall be established, the manner in which it shall be organized, the powers it shall have, &c.” See Rights of Man, part I. p. 30.
Vattel, in treating of the fundamental laws of a state, observes, “that a nation may en *24 trust the exercise of the legislative power to the prince, or to an assembly, or to that assembly and the prince, jointly ; who have then a right of making new, and of abrogating old laws. It is here demanded, whether if their power extends as far as the fundamental laws,they may change the constitution of the state? to this he answers, we may decide with certainty, that the authority of these legislators does not extend so far, and that they ought to consider the fundamental laws .as sacred, if the nation has not in express terms given them power to change them. Ror the constitution of the state 76 ought to be fixed ; *and since that was first established by the nation, which afterwards trusted certain persons with the legislative powers, the fundamental laws are excepted from their commission. In short, these legislators derive their power from the constitution : how then can they change it, without destroying the foundation of their authority?” Vattel, p. 31.
That the legislature of this commonwealth have regarded our Constitution in this light, will appear from more than one authority. I shall select the preamble of an act passed in May session, 1783, c. 32, Rev. Co. 204, entitled an act to amend an act, entitled an act concerning the appointment of sheriffs, which recites “that the former act was contrary to the Constitution, or form of government,” for which reason it was repealed.—A second instance may be found in the acts of 1787, c. 23, which recites “that a former act, entitled an act to extend the powers of the governor and council, Rev. Co. 81, appears to the present general assembly to be contrary to the true spirit of the constitution :” wherefore it was repealed.—Two other instances may be found, the first in the repeal* of the act of 1787, c. 39, for establishing district courts, whereby the judges of the court of appeals were required to act as judges of the district 77 *courts: the second, in an act of the last session, 1792, ch. 28, providing for the republication of the laws of this commonwealth, which directs “that the bill of rights, and Constitution, or form of government, shall be prefixed to the code of laws.”—Other instances doubtless may be found in our laws, where the legislature have either expressly, or tacitly, recognized the Constitution. as paramount to their own legislative acts; so that reasoning, in this instance, is confirmed by precedent. •
But here an objection will no doubt be drawn from the authority of those writers who affirm, that the constitution of a state is a rule to the legislature only, and not to the judiciary, or the executive : the legislature being bound not to transgress it; but that neither the executive nor judiciary can resort to it to enquire whether they do transgress it, or not.
This sophism could never have obtained a moment’s credit with the world, had such a thing as a written Constitution existed before the American revolution. “All the governments that now exist in the world, (says a late writer,*) except the United States of America, have been fortuitously formed. 78 They are the produce *of chance, not the work of art. They have been altered, impaired, improved, and destroyed, by accidental circumstances, beyond the foresight or control of wisdom ; their parts thrown up against present emergencies, formed no systematic whole.” What the constitution of any country was or rather was supposed to be, could only be collected from what the government had at any time done ; what had been acquiesced in by the people, or other component parts of the government; or what had been resisted by either of them. Whatever the government, or any branch of it had once done, it was inferred they had a right to do again. The union of the legislative and executive powers in the same men, or body of men, ensured the success of their usurpations ; and the judiciary, having no written constitution to refer to, were obliged to receive whatever exposition of it the legislature might think proper to make. But, with us, the constitution is not an “ideal, thing, but a real existence : it can be produced in a visible form its principles can be ascertained from the living letter, not from obscure reasoning or deductions only. The government, therefore, and all its branches must be governed by the constitution. Hence it becomes the first law of the land, and as such must be resorted to on every occasion, where it becomes necessary to expound what the law is. This exposition it is the duty and office of the judiciary 79 to make ; our constitution *expressly declaring that the legislative, executive, and judiciary, shall be separate and distinct, so that neither exercise the powers properly belong to the other. Now since it is the province of the legislature to make, and of the executive to enforce obedience to the laws, the duty of expounding must be exclusively vested in the judiciary. But how can any just exposition be made, if that which is the supreme law of the land be withheld from their veiw? Suppose- a question had arisen on either of the acts before cited, which the legislature have discovered to be unconstitutional, would the judiciary have been bound by the act, or by the constitution?
But that the constitution is a rule to all the departments of the government, to the judiciary as well as to the legislature, may, I think, be proved by reference to a few parts of it.
The bill of rights, art. 8, provides, that in all capital and criminal prosecutions, the party accused shall be tried by a jury of the vicinage, and cannot be found guilty without their unanimous consent.
Suppose any future act of the legislature should abridge either of these privileges, what would be said of a court that should act in conformity to such an act?
*Again; art. 9 declares that excessive bail ought not to be required. The act† concerning bail, I apprehend, extends *25 not to the superior courts ; perhaps not even to the county courts. Is this injunction a mere dead letter, because the legislature have not yet passed a law equally extensive in its obligation?
Art. 10 declares that general warrants are illegal and oppressive, and ought not to be granted. Is this too a dead letter, because we have no act of the legislature to enforce the obligation?
Art. 16 secures the free exercise of our religious duties, according to the dictates of every man’s own conscience. Should the legislature, at any future period, establish any particular mode of worship, and enact penal laws to support it, will the courts of this commonwealth be bound to enforce those penalties?
Art. 15 of the constitution, declares that the clerks of courts shall hold their offices during good behaviour, to be judged of and determined in the general court. Can any legislative act give any other court cognizance of such a case ? Or can any impeachment be tried in any court of this commonwealth, except this court, and 81 the *court of appeals, even should an act of the legislature (as Was once contemplated) erect a court for that especial purpose?
From all these instances it appears to me that this deduction clearly follows, viz. that the judiciary are bound to take notice of the constitution, as the first law of the land; and that whatsoever is contradictory thereto, is not the law of the land.
And here I shall avail myself of the reasoning of one of the ablest political writers that has appeared in America.*
“Some perplexity respecting the right of the courts to pronounce legislative acts void, because contrary to the constitution, has arisen,” he observes, “from an imagination that the doctrine would imply a superiority of the judiciary over the legislative power. It is urged that the power which can declare the acts of another void, must necessarily be superior to the one whose acts may be declared void.
“But there is no position which depends on clearer principles, than that every act 32 of a delegated authority, *contrary to the tenor of the commission under which it is exercised, is void. No legislative act therefore, contrary to the constitution, can be valid. To deny this would be to affirm, that the deputy is greater than the principal ; that the servant is above his master; that the representatives of the people are superior to the people themselves.
“If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is conclusive upon the other departments, it may be answered that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the constitution. It is not otherwise to be supposed that the constitution could intend to enable the representatives of the people to substitute their will to that of their constituents. It is far more rational to suppose that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority. The interpretation of the laws is the proper and particular province of the courts. A constitution is in fact, and must be regarded by the judges, as a fundamental law. It therefore belongs to them to ascertain its meaning, as well as the meaning of any particular act proceeding from 83 the legislative *body. If there be an irreconcilable variance between the two, that which has the superior obligation and validity ought of course to be preferred ; or, in other words, the constitution ought to be preferred to the statutes ; the intention of the people to the intention of their agents.
“Nor does this conclusion by any means suppose a superiority of the judiciary to the legislative power. It only supposes that the power of the people is superior to both; and that where the will of the leg-islature, declared in its statutes, stands in opposition to that of the people, declared in the constitution, the judges ought to be governed by the latter, rather than the former. They ought to regulate their decisions by the fundamental laws, rather than those which are not fundamental.”
“*It can be of no weight to say that the courts, on the pretence of a repugnancy, may substitute their own pleasure to the constitutional intentions of the legislature. This might as well happen in the case of two contradictory statutes ; or it might as well happen in every adjudication upon any single statute. The courts must declare the 84 sense of the law. The observation, if *it proved any thing, would prove that there ought to be no judges distinct from the legislative body.”
Such is the reasoning of one of the most profound politicians in America. It is so full, so apposite, and so conclusive, that I think it unnecessary to add any thing farther on the subject, and shall now proceed to the second point, viz.
2. Whether, according to the constitution of this commonwealth, a judge of the general court can exercise the functions of a judge -in chancery?
There again I must recur to one of the fundamental principles of our government, a principle essentially and indispensably necessary to its existence as a free government, exercised by the immediate authority of the people, delegated to the servants of their own choice, viz. the separation of the legislative, executive, and judiciary departments.
These departments, as I have before observed, our constitution declares shall be for ever separate and distinct. To be so, they must be independent one of another, so that neither can control, or annihilate the other.
*26 *The independence of the judiciary results from the tenure of their office, which the constitution declares shall be during good behaviour. The offices which they are to fill must therefore in their nature be permanent as the constitution itself, and not liable to be discontinued or annihilated by any other branch of the government. Hence the constitution has provided that the judiciary department should be arranged in such a manner as not to be subject to legislative control. The court of appeals, court of chancery, and general court, are tribunals expressly required by it; and in these courts the judiciary power is either immediately, or ultimately vested.
These courts can neither be annihilated nor discontinued by any legislative act; nor can the judges of them be removed from their offices for any cause, except a breach of their good behaviour.
But if the legislature might at any time discontinue or annihilate either of these courts, it is plain that their tenure of offiqe might be changed, since a judge, without any breach of good behaviour, might in effect be removed from office, by annihilating or discontinuing the office itself.
This has been proved in the case of the former court *of appeals.* The moment it was discovered that that court was not constituted according to the directions of the constitution, the legislature, without any charge of a breach of good behaviour by any one of that court, rempved a majority of the judges from their office, as judges of that court, by new modelling the court altogether.
I am far from considering this act of the legislature as unconstitutional, for 'reasons that I shall hereafter mention.
But it proves that the judiciary can never be independent, so long as the existence of the office depends upon the will of the ordinary legislature, and not upon a constitutional foundation.
The district courts considered as independent of the general court, and not a modification of it, are merely legislative courts, and consequently may be discontinued, or annihilated, whenever the legislature may think proper to abolish them. And if the judges of those courts held their offices only as judges of the district courts, they might be virtually, and in fact, removed from office, as the judges of the former court of appeals were, by legislative act, discontinu87 ing the courts, and transferring *their jurisdiction to other tribunals, without any breach of good behaviour.
Hence arises a most important distinction between constitutional and legislative courts. The judges of the former hold an office coexistent with the government itself, and which they can only forfeit by a breach of good behaviour. The judges of the latter, although their commissions should import upon the face of them, to be during good behaviour, may be at any time discontinued from their office, by abolishing the courts. In other words, constitutional judges may be an independent branch of the government, legislative judges must ever be dependent on that body at whose will their offices exist.
If the principles of our government have established the judiciary as a barrier against the possible usurpation, or abuse of power in the other departments, how easily may that principle be evaded by converting our courts into legislative, instead of constitutional tribunals?
To preserve this principle in its full vigour, it is necessary that the constitutional courts should all be restrained within those limits which the constitution itself seems to have assigned to them respectively.
*What those limits are, may be collected from the 14th article,* which provides for the appointment of “judges of the supreme court of appeals, and general court, judges in chancery, judges of admiralty,” &c. This specification of judges of several tribunals, would lead us of itself to conclude, that the tribunals themselves were meant to be separate and distinct.† This conclusion seems to be warranted by two circumstances, the one extrinsic, the other arising out of the constitution itself. Those who recollect the situation of our jurisprudence, at the time of the revolution, will remember that the union of civil and criminal, common law, and equity jurisdiction, all in the general court, was one of the most obvious defects of that system. In truth, nothing can be more dangerous to the citizen, than the union of criminal courts, and courts of equity. On the European continent, wheresoever the civil law has been adopted, criminal and civil proceedings have been conducted upon the like principles : the defendant in civil cases might be examined upon oath by interrogatories, to which if he gave not satisfactory answers he might be committed until he did : this principle 89 being extended *to criminal cases, was denominated by the moderate terms of putting the person accused to the question : but inasmuch as the forcing a criminal to accuse himself on oath, might prove a snare to his conscience, the obligation to answer to the question was inforced by torture. To separate for ever, courts, whose principles and proceedings are so diametically opposite as those of the common and civil law, was, I should presume, one of the fundamental principles which the framers of our constitution had an eye to. They, therefore, distributed the powers of the then existing general court into three distinct branches, viz. the court of appeals, the court of chancery, and the court of general jurisdiction, at common law. The repetition of the term, judges, shows that it was in con- *27 temptation that both the tribunals, and the judges should he distinct and separate. This is farther confirmed by art. 16 and 17 :* the former of which provides that impeachments in general shall be prosecuted in this court, the latter that impeachments against the judges of this court, shall be prosecuted in the court of appeals. Nothing, then, can be clearer than that the constitution intended they should be distinct judges of distinct courts. And hence I am satisfied, that the former court of appeals was unconstitutionally organized. This 90 reasoning, I apprehend, *will apply no less forcibly to the separation of the general court from the court of chancery. A judge of the general court, if impeached, can be prosecuted in the court of appeals only ; a judge in chancery only in the general court: if these officers be united in the same person, it must be by separate commissions ; a judgment on impeachment in the general court cannot vacate the commission of a judge of that court, because the constitution has assigned another tribunal, where a judge of that court shall be tried ; a judgment in the court of appeals cannot vacate the commission of a judge in chancery,because he must be tried, as such, in the general court. Hence it seems to me we are driven to conclude that the constitution meant that the two officers shall be separate and distinct. This construction removes every difficulty, the contrary, I apprehend, creates a multitude, and those insurmountable.† In pursuance of this direction, contained in the constitution, the legislature, when it set about organizing the 91 *courts, distributed them as above-mentioned. The criminal and common law court, was separated from the court of equity; and both from the court of appeals, in form, though not in reality, until the legislature, by the act of 1788, c. 68 corrected its former error. And thus distinct have they remained, until the act of the last session, which hath not indeed united the constitutional courts, but hath blended them in effect, by assigning the functions of a judge in chancery to the judges of this court; and if carried into effect may lead to the total annihilation of all the courts which the constitution had in contemplation to establish.
I have said before (p. 86), that the district courts considered as independent of the general court, and not a modification of it, are mere legislative, and not constitutional courts. If they are a modification only of the general court, it flows from what I have ! already said, that the constitution prohibits the exercise of chancery jurisdiction therein. If they be mere legislative courts, it cannot be the duty of any judge of a constitutional court, merely as such, to exercise the functions of a judge of these courts : and it is, I conceive, expressly contrary to the duty of a constitutional judge of one court, to exercise the functions of a constitutional judge of another distinct constitutional court.
*It appears then immaterial, whether, on the present question, the district courts are to be considered as branches of the general court, or not: yet it would be easy to show, that as they are at present modified and organized, they are nothing more than branches of that court ; and not distinct, independent, legislative courts ; unless the operation of the act in question should be construed to affect and change their whole system and constitution.
But, if they are mere legislative courts, they may, at any time, be organized at the will of the legislature : legislative judges may be appointed, the tenor of whose commission may import that their office shall be during good behaviour, and yet that office be discontinued whenever the legislature may think fit. If the jurisdiction of the court of chancery can be constitutionally transferred to them, so may that of the general court, and of the court of appeals. In fine these legislative courts may absorb all the jurisdictions, powers and functions of the constitutional courts. These last then must either be suppressed, as useless, which the constitution forbids ;* or the judges of them will hold sinecures instead of offices, which is expressly contrary to the bill of rights, art. 4. Add to this that such an arrangement 93 must ever render the judiciary *the mere creature of the legislative department, which both the constitution,† and the bill of rights‡ most pointedly appear to have guarded against.
2. I shall now proceed to take a short view of the subject, as founded upon a solemn decision of the court of appeals, on a similar occasion.
It will not, I presume, be denied that the decisions of the supreme court of appeals in this commonwealth, upon any question, whether arising upon the general principles of law, the operation or construction of any statute or act of assembly, or of the constitution of this commonwealth, are to be resorted to by all other courts, as expounding, in their truest sense, the laws of the land; and where any decision of that court applies to a case depending before any other tribunal, that tribunal is bound to regulate its decisions conformably to those of the court of appeals. This postulatum I conceive to be too obviously founded upon the principles of our government to require an attempt to demonstrate it. Proceeding upon this ground, I shall take up the question upon the authority of a previous decision of that court, on a similar question.
*28 *In the year 1787, the first act establishing district courts was passed. This act “declared it to be the duty of the judges of the high court of appeals to attend the said court, allotting among themselves the districts they should respectively attend; three judges to be allotted to each district, any two of whom should constitute a court.” Ch. 39, sect. 3.
It should be remembered, that at that time the court of appeals was composed of the judges of the high court of chancery, judges of the general court, and judges of the court of admiralty. The office of the judge of the court of appeals was, at that time, as it were, incidentally annexed to their appointment to a seat on either of the other tribunals.
A part of the duty assigned to the court of appeals by that act was the appointment of clerks to the district courts, which the act required should be done at the next succeeding session of the court of appeals., Ib. sect. 2.
On the 12th of May following, the court made the following entry upon their records. “On consideration of a late act of assembly, entitled an act establishing district courts, after several conferences, and upon mature deliberation, the courts do adjudge 95 that clerks of *the said courts ought not now to be appointed, for reasons contained in a remonstrance to the general assembly :”—which remonstrance is likewise entered on record, and contains, among other things, the following important passages.
“1. That in discussing the act establishing district courts, the court found it unavoidable to consider, whether the principles of that act do not violate those of the constitution, or form of government, which the people, in 1776, when the former bands of their society were dissolved, established as the foundation of that government which they judged necessary for the preservation of their persons and property; and if such violation were apparent, whether they had power, and it was their duty to declare that the act must yield to the constitution ?
“2. That they found themselves obliged to decide, whatever temporary inconveniencies might arise, and in that decision to declare, that the constitution and the act were in opposition, and could not exist together, and that the former must control the latter.
“3. That the propriety and necessity of the independence of the judges is evident in reason, and the nature of their office, since they are to decide between government 96 ‘•'■'and the people, as well as between contending citizens; and if they be dependent on either, corrupt influence may be apprehended.
“4. That this applies more forcibly to exclude a dependence on the legislature, a branch of whom, in cases of impeachment, is itself a party.
“5. To obviate a possible objection that the court, while they are maintaining the independence of the judiciary, are countenancing encroachments of that branch upon the departments of others, and assuming a right to control the legislature, it may be observed, that when they decide between an act of the people, and an act of the legislature, they are within the line of their duty, declaring what the law is, and not making a new law.
“6. That although the duties of their office were not ascertained at the time of establishing the constitution, yet in respect thereto, the constitution gives a principle, namely, that ‘no future regulation should blend the duties of the judges of the general court, court of chancery, and court of admiralty, which the constitution seems to require to be exercised by distinct persons.’
“7. That the assigning to the judges of chancery and admiralty jurisdiction in common law cases, may be considered as a new office.”
*These declarations, according to my weak apprehensions, comprehend the present question in the fullest extent. I should therefore be of opinion, upon the ground of this authority, as well as upon the conviction of my own mind, independent thereof, which, unless so fortified, I might have mistrusted, that we ought to certify to the district court of Dumfries “That in the opinion of this court, a judge of the general court cannot constitutionally exercise the functions of a judge in chancery.” But the judges who have already delivered their opinions, although some of them appear to dissent from me upon this point, having unanimously concurred in another, viz. That the functions of a judge in chancery can only be exercised by those who may be constituted judges in chancery, in the manner prescribed by the constitution ; I shall concur in their unanimous judgment, without offering any reasons on a subject which has been so fully and satisfactorily discussed by them.
When the court unanimously agreed, and the certificate was in these words :
“Ordered, that it be certified to the sa:d district court (Dumfries), as the opinion of this court, “that the motion of the plaintiff, praying an injunction, to stay the proceedings on a judgment obtained against him in the said district court by the defendant, ought 98 to be overruled, *because the powers and duties assigned to be performed by the eleventh section of the act of the last session of assembly, entitled ‘an act reducing into one the several acts concerning the establishment, jurisdiction, and powers of the district courts,’ can only be executed by those who may be constituted judges in chancery, in the manner prescribed by the constitution of this commonwealth.”
Remonstrance of the Court of Appeals, to the General Assembly.
At a court of appeals, held at the court house, in the city of Richmond, on Tuesday, the twenty-ninth day of April, one thousand seven hundred and eighty-eight, and thence continued, by adjournments, until Monday, the twelfth day of May, next following, then and there present:
William Fleming, Edmund Pendleton,
Henry Tazwell, George Wythe,
Richard Cary, John Blair,
James Henry, and Paul Carrington,
John Tyler, Esquires, Peter Lyons,
Judges.
*29 *On consideration of a late act of assembly intituled “an act establishing district courts,” after several conferences, and upon mature deliberation, the court do adjudge that clerks of the said courts ought not now to be appointed, for reasons contained in a remonstrance to the general assembly, in the words following, to wit:
To the honourable the speakers and other members of the senate and house of delegates of the commonwealth of Virginia in general assembly.
The Respectful Remonstrance of the Court of Appeals.
The remonstrants finding themselves called upon by a late act of the general assembly, intituled, “an act establishing district courts,” to proceed at this session to the appointment of clerks to the said courts, that whole act was necessarily brought into their view ; in considering which they encountered many difficulties, of an ordinary nature : such as whether their power of appointing now, though directed by the 2d section, was not controlled by the 116th, declaring that the act should take effect, and be in force, from and after the first day of July, in the year 1788, and not before; whether the district courts have jurisdiction of any suits now depending in the general court, of above thirty pounds value ; whether any, and what, provision was made for the trial of criminals who 100 *might remain in the public jail after the session of the general court in June next, or who might be examined and committed prior to the said first day of July ; and whether for want of precision in several other parts of the law, it was, in the respective cases, to operate from the time of passing, or from the first day of July.
(In other instances, particularly in the construction of the late execution law, regularly brought before the court this term, they have to lament the last difficulty, which they found so great that nothing but the repose of the community, and the necessity of having one uniform system in that respect, could have induced the court to decide upon it at last without further consideration.)
But in the progress of their discussion, they found it unavoidable to consider more important questions, viz : whether the principles of this act do not violate those of the constitution or form of government, which the people in 1776, when the former bands of their society were dissolved, established as the foundation of that government which they judged necessary for the preservation of their persons and property; and if such violation were apparent, whether they had power, and it was their duty, to declare that act must yield to the constitution.
And here they have again to lament, that there should *be occasion to decide those important questions in any case, especially at a time when the minds of the citizens are agitated upon other questions of great and national concern, more so that the necessity should occur in a case wherein their individual interests are involved, and still more that a decision one way might suspend, though for a short time, the beneficial effects of a law tending to promote the speedy and easy administration of justice.
On this view of the subject, the following alternatives presented themselves to the court; either to decide those questions, or resign their offices. The latter would have been their choice, if they could have considered the questions as affecting their individual interests only ; but viewing them as relating to their office, and finding themselves called by their country to sustain an important post as one of the three pillars on which the great fabric of government was erected, they judged that a resignation would subject them to the reproach of deserting their station, and betraying the sacred interests of society entrusted with them, and on that ground found themselves obliged to decide, however their delicacy might be wounded, or whatever temporary inconveniencies might ensue, and in that decision to declare that the constitution and the act are in opposition and cannot exist together, and that the for-102 mer must ^control the operation of the latter. If this opinion declaring the supremacy of the constitution needed any support, it may be found in the opinion of the legislature themselves, who have in several instances considered the constitution as prescribing limits to their powers as well as to those of the other departments of government.
In forming their judgment upon both questions they had recourse to that article in the declaration of rights, that no free government, or the blessings of liberty, can be preserved to any people but (among other things) by frequent recurrence to fundamental principles ; an article worthy to be written in letters of gold. The propriety and necessity of the independence of the judges is evident in reason, and the nature of their office, since they are to decide between government and the people as well as between contending citizens, and if they be dependent on either, corrupt influence may be apprehended, sacrificing the innocent to popular prejudice, and subjecting the poor to oppression and persecution by the rich; and this applies more forcibly to exclude a dependence on the legislature, a branch of whom, in cases of impeachment, is itself a party. This principle supposed, the court are led to consider, whether the people have secured, or departed from it, in their constitution or form of government. In that solemn act they discover the people distributing the governmental powers into three great branches, legis103 lature, ^executive, and judiciary, in order to preserve that equipoise which they judged necessary to secure their liberty ; declaring that those powers be kept separate and distinct from each other, and that no person shall exercise at the same time an office in more than one of them. The independence of the two former could not be admitted, because in them a long continuance in office might be dangerous to liberty, and therefore they provided for a change, by frequent elections at stated periods ; but in the last, from the influence of the principle before observed *30 upon, they declared that the judges should hold their offices during good behaviour. Their independence would have been rendered complete, by fixing the quantum of their salaries, which perhaps would have been done, if the duties of office had been at that time ascertained. But although it was not then done, yet in respect to this, the constitution gives a principle, not to be departed from, declaring that the salaries shall be adequate and fixed, leaving it to the legislature to judge what would be adequate when they should appoint the duties. And when they had so done, they exercised their whole power over the subject, and the salary was thenceforth to be considered as fixed, while the duties should continue the same. And when public utility should require an increase or diminution of duty, there should be an analogous alteration of salary, with this restriction however, that such regulation should 104 not blend the duties of *the judges of the general court, court of chancery, and court of admiralty, which the constitu-' tion seems to require to be exercised by distinct persons ; and the legislature appear to have so considered it in the arrangement of those courts.
The court of appeals, of whomsoever constituted, must necessarily act upon the subjects referred to all the others, and therefore the forming it so as to consist of all the judges is no violation of the constitution ; and that mode, assimilated to adjournments of cases before all the judges of England in the exchequer chamber, may have been dictated by necessity.
The court then proceeded to consider what had been done by the legislature in consequence of the constitution. In the October session of 1777, they passed two acts, organizing the general court and court of chancery, giving to the former jurisdiction at common law, in civil cases as well as criminal, and to the latter jurisdiction in all cases in equity. The duties of each were distinctly pointed out, and a salary of five hundred pounds to each judge was thought by the legislature to be an adequate reward for those duties, and this previous to the appointment of any judges. The election of the judges followed, when four of those at present in office were of the number elected ; who, thinking as they 105 still * think the salary was adequate to the services, declined other pursuits, and accepted their appointments, under a confidence that the constitution would entitle them to that salary, so long as they should perform the duty, in an upright manner.
The nominal sum they conceived was to be paid them in specie, or in something equivalent thereto, and they have reason to believe the legislature so understood it, from laws in force at that period, making it penal to demand an allowance for the difference between specie and paper money.
And though the other judges have been called into duty by subsequent appointments, they may be supposed to stand upon the same ground of original compact. The court of admiralty, indeed, was not permanently constituted until the year one thousand seven hundred and seventy-nine, and the judges then appointed; yet by being made judges of the court of appeals, they have ever since been put upon the same footing with their brethren in point of salary. The various substitutions of paper money and tobacco for specie, which was not to be had, the judges considered as temporary expedients, which, though operating greatly to the diminution of their salaries, were not designed to affect their independence ; and therefore they acquiesced, 106 content to share in the public ''calamities, in hopes of a recurrence to the constitutional principle in better times. And they considered in the same light the act of one thousand seven hundred and eighty-one, stating the salary at three hundred pounds, as dictated by necessity, and not proceeding from design, and therefore, did not conceive it to be their official duty to interpose.
But the act now under consideration, presenting a system, which assigns to the judges of the chancery and admiralty jurisdiction in common law cases, which so far may be considered as a new office, the labour of which would greatly exceed that of the former, without a correspondent reward, and to the judges of the general court duties, which though not changed as to their subjects are yet more than doubled, without any increase of salary, appeared so evident an attack upon the independency of the judges that they thought it inconsistent with a conscientious discharge of their duty to pass it over. Eor vain would be the precaution of the founders of our government to secure liberty, if the legislature, though restrained from changing the tenure of judicial officers, are at liberty to compel a resignation by reducing salaries to a copper, or by making it apart of the official duty to become hewers of wood and drawers of water, or if in case of a contrary disposition, they can make salaries exorbitant, or by lessening the duties render 107 offices almost sinecures; *the independency of the judiciary is in either case equally annihilated. The court, however, willing to hope, that in the present-instance the legislature had no such design,, but that inattention or some other circumstances might occasion the deviation, and' that upon a revision of the subject, this law will be placed upon unexceptionable ground, had only to consider what ought to be their conduct in the mean time. The result of which was that they ought not to do any thing officially in execution of an act which appeared to be contrary to the spirit of the-constitution, and therefore they declined to-appoint the clerks of the district courts under the said act.
To obviate a possible objection, that the-court, while they are maintaining the independency of the judiciary, are countenancing' encroachments of that branch upon the departments of others, and assuming a right to control the legislature, it may be observed that when they decide between an act of the' people and an act of the legislature they are within the line of their *31 duty, declaring what the law is, and not making a new law. And ever disposed to maintain harmony with the other members of government, so necessary to promote the happiness of society, the court most sincerely wish, that the present infraction of the constitution may be remedied by the legislature themselves, and thereby all further uneasiness on the occasion be prevented.
But should their wishes be disap108 pointed *by the event, they see no other alternative for a decision between the legislature and judiciary than an appeal to the people, whose servants both are, and for whose sakes both were created, and who may exercise their original and supreme power whensoever they think proper. To that tribunal, therefore, the court, in that case, commit themselves, conscious of perfect integrity in their intentions, however they may have been mistaken in their judgment.
It is ordered that the President of the court do deliver the said remonstrance to his excellency the Governor, with a request that he will be pleased to lay the same before the General Assembly at their first session.
(Signed) Edmund Pendleton.
Subsequent to this Remonstrance, the whole of the judges resigned, and afterwards re-qualified, under an act for amending the act entitled, “An act constituting the court of appeals,” passed the 22d of December, 1788.

Passed in 1792.

In the American, edition of the Encyclopaedia, “Constitutional in matters of policy, signifies the form of government established in any country or kingdom.
“Constitution also denotes an ordinance, decision, regulation, or law made by authority, superior ecclesiastical or civil.”
That the word constitution in the title of the instrument under consideration, is not synonymous with ordinance or law, (as seems to be the opinion of the able author of “Notes on Virginia,”)but is used in the former sense, is evident from its being called "the constitution, or form of government, &c.”

 See second section of the Constitution.

That justices of the County Courts are eligible to either House of Assembly.

See note, p. 24.

There are but three lines of conduct, one of •which must be pursued on such an occasion,—either
1st, To refuse to decide the question at all, which would be a dereliction of duty ; or
2dly, To wait for the legislature to decide whether the act be unconstitutional, which would be contrary to that article in the Constitution, which declares that “the legislative, executive, and judiciary departments shall be separate and distinct, so that neither exercise the powers properly belonging to the other.”—Since to decide whether the plaintiff or the defendant under the existing laws have a right, is a judicial act, and to decide whether the act be a void law as to a right vested or in litigation, is in fact to decide which of the parties have the right.
There remains therefore when the question occurs, but one thing to be done by the judiciary,—which is,
3dly, To decide that the act is void, and therefore that the claimant under it cannot succeed.

Bill of Eights, Art. 15.

Tlie convention came to a resolution to instruct their delegates in Congress to move, that body to declare America independent on the 15th of May, 1776, and the same day appointed a committee to prepare the draught of the new constitution, or form of government. See the journals of the convention assembled in "Williamsburgh, May, 1776.

1787, ch. 67.

M’Intosh on the Fr. Rev. 115.

1785, ch. 80.

Pub. v. 3, p. 293.

Publius. 395.

Virg-. Acts vi. 1788,ch. 68.

Const. Virg. art.14.

 Since every word in that instrument, the constitution of the commonwealth, should he construed to have its effect; a rule applied to all written instruments whatsoever, and more peculiarly applicable, I should presume, to that which expresses the collective, and sovereign will and intention of the people.

Const. Virg. arts. 16 and 17.

 A curious question might here he propounded. Suppose a judge of the general court, holding also a commission as a judge in chancery, and sitting as a judge of a district court, where his functions were united, should receive a bribe from one of the parties to a suit depending there before him : that on the trial at law he shall endeavor to influence the jury, and shall after grant an injunction to the party from whom he received the bribe : must there be two impeachments and two trials, in different courts, in this case ; or could one trial, and one judgment, vacate hoth commissions ?

Art. 14.

Const. V. art. 3.

Bill of Rights, art. 5.